IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

COASTAL FEDERAL CREDIT UNION )
                                                ) Civil Action No.: 5:08-CV-00017-BR
    v. )
                                                )
LANDON TERRELL HARDIMAN, JR. )
and DAFFNEY MARRITT HARDIMAN )
_____)

**AMICUS BRIEF IN SUPPORT OF APPELLANT
BY THE CREDIT UNION NATIONAL ASSOCIATION
AND THE NORTH CAROLINA CREDIT UNION LEAGUE**

James S. Livermon, III
Poyner & Spruill LLP
Post Office Box 353
Rocky Mount, North Carolina 27802-0353
Telephone: (252) 972-7091
Facsimile (252) 972-7045
Email: jlivermon@poynerspruill.com

*Attorneys for the Credit Union National Association and
the North Carolina Credit Union League*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

APPELLATE JURISDICTION ............................................................................................... 1

ISSUES PRESENTED AND STANDARD OF REVIEW ..................................................... 1

I.      ISSUES ON APPEAL .................................................................................................. 1

II.     STANDARD OF REVIEW .......................................................................................... 1

STATEMENT OF THE CASE ................................................................................................ 2

I.      FACTS .......................................................................................................................... 2

II.     BANKRUPTCY COURT PROCEEDINGS ............................................................... 3

ARGUMENT ............................................................................................................................. 4

       A.     Congress' purpose with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 was to restore integrity to the bankruptcy system and promote fairness and equality among debtors and creditors. ..................................................................................... 4

       B.     The new provisions related to reaffirmation agreements, read in conjunction with Congress' purpose of the Act, support a reversal of the Bankruptcy Court and a ruling in favor of Coastal Federal. .................................. 5

       C.     The Bankruptcy Court's decision unfairly impairs the rights of creditors to protect and recover the value of their investment. ........................................ 12

CONCLUSION ....................................................................................................................... 14

CERTIFICATE OF SERVICE ............................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Dumont v. Ford Motor Credit Co. (In re Dumont)*,
___ B.R. ___ (BAP 9th Cir. 2008) (opinion attached) ............................................................. 11

*In re Donald*,
343 B.R. 524 (Bankr. E.D.N.C. 2006) ................................................................. 7, 9, 12

*In re McFall*,
356 B.R. 674 (Bankr. N.D. Ohio Nov. 22, 2006) ................................................................. 8

*In re Riggs*,
2006 Bankr. LEXIS 2732, 2006 WL 2990218 (Bankr. W.D. Mo. Oct. 12, 2006) ................. 8

*In re Rowe*,
342 B.R. 341 (Bankr. D. Kan. 2006) ................................................................. 10, 11, 12

*In re Ruona*,
353 B.R. 688 (Bankr. D.N.M. 2006) ................................................................. 8

*In re Steinhaus*,
349 B.R. 694 (Bankr. D. Idaho 2006) ................................................................. 8

*United States v. Ron Pair Enter., Inc.*,
498 U.S. 235 (1989) ................................................................. 10

*Waugh v. Internal Revenue Service*,
109 F.3d 489 (8th Cir. 1997) ................................................................. 11

**STATUTES**

11 U.S.C. § 102(5) ................................................................. 7, 8

11 U.S.C. §§ 362(h), 521(a)(6) and 521(d) ................................................................. 7

11 U.S.C. § 521(a)(1) ................................................................. 7

11 U.S.C. §521(a)(6) ................................................................. 1, 8, 10, 11

11 U.S.C. §521(d) ................................................................. 1, 8

11 U.S.C. §521(d) and 362(h) ................................................................. 3

11 U.S.C. § 524(k) ................................................................. 5

26 U.S.C. § 6503(b) and (h) ................................................................. 11

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ................................... 4, 14

**OTHER AUTHORITIES**

3 Collier on Bankruptcy ¶ 362.10A, at 362-119 ............................................................................ 7

Citing 3 Colliers on Bankruptcy ¶ 362.10A, at 362-120 (Alan N. Resnick & Henry J. Sommer, 15th ed. Rev. 2006) ........................................................................................... 7, 8

Debtor Protections. Section 524(k) .............................................................................................. 5

H.R. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. (2005) ........................................................... 6

H.R. Rep. No. 109-31, pt. 1 (2005) ............................................................................................ 11

H.R. Rep. No. 109-31, Pt. 1 (2005) ............................................................................................ 10

Local Rule 4008 ........................................................................................................................... 6

S. 256 .......................................................................................................................................... 10

S. 257 ............................................................................................................................................ 6

## APPELLATE JURISDICTION

The Credit Union National Association[1] and the North Carolina Credit Union League[2] (collectively referred to as "Amicus") adopt Appellant's statement of appellate jurisdiction, as stated in Appellant's Brief.

## ISSUES PRESENTED AND STANDARD OF REVIEW

### I. ISSUES ON APPEAL

1. Did the Bankruptcy Court err in determining that the Debtors "entered into" a reaffirmation agreement with Coastal Federal as called for under 11 U.S.C. §521(a)(6) notwithstanding that the Bankruptcy Court subsequently invalidated the reaffirmation agreement in question?

2. Did the Bankruptcy Court err in determining that the provisions of new 11 U.S.C. §521(d) removing any federal bankruptcy law limitation on enforcement of "*ipso facto* clauses" are not available to a secured creditor such as Coastal Federal when a reaffirmation agreement is signed by the debtor but ultimately disapproved by the Bankruptcy Court?

### II. STANDARD OF REVIEW

Amicus adopts Appellant's statement of the standard of review, as stated in Appellant's Brief.

---

[1] The Credit Union National Association, Inc. ("CUNA"), a non-stock corporation organized in 1934, is the leading national trade association serving America's credit unions, which are member-owned financial cooperatives. CUNA's 7,251 members (as of September 30, 2007) include state and federal credit unions located throughout all 50 states and the District of Columbia, accounting for approximately 90 percent of the credit unions in the United States. CUNA provides many services to its members, including representation in legislative and regulatory forums, research and information, public relations, continuing professional education and educational materials, and business development. CUNA also engages in other activities designed to promote the ability of its member credit unions to deliver financial services to their owner-members.

[2] The North Carolina Credit Union League serves 114 member credit unions in the State of North Carolina consisting of 2,900,000 members and $25 billion in assets.

## STATEMENT OF THE CASE

Amicus has recited below the statement of the facts and of the Bankruptcy Court proceedings as stated by the Appellant in its brief. Amicus adopts these statements and incorporates them herein.

I. FACTS

1. On are about February 21, 2005, the Debtors purchased a 2005 Chevrolet Equinox, VIN #2CNDL13F056136198 (herein the "Vehicle") pursuant to the terms of an installment sales contract (herein collectively the "Contract") of even date. The Contract subsequently was assigned to Coastal Federal and Coastal Federal is currently the sole owner and holder of same.

2. Pursuant to the terms of the Contract, Coastal Federal has a senior perfected first lien on the Vehicle that it duly and timely perfected.

3. The Debtors commenced this case by a Chapter 7 petition filed on May 2, 2007.

4. In connection with such petition, the Debtors filed a Statement of Intention reflecting that they intended to reaffirm the debt to Coastal Federal secured by the Vehicle.

5. On or about June 11, 2007, the undersigned counsel for Coastal Federal forwarded a proposed reaffirmation agreement to the Debtors' counsel, making no modifications to the parties' original agreement as set forth in the Contract.

6. The Debtors subsequently completed and signed such Reaffirmation Agreement, and completed Part D thereof showing $3,925 in monthly income and $2,535 in currently monthly expenses, leaving $1,390 to make the required monthly payments on the debt to Coastal Federal.

7. The Reaffirmation Agreement was then filed with this Court but the Debtors' attorney did not sign and file any affidavit on behalf of the Debtors stating that he found the

Reaffirmation Agreement to be in the best interest of the Debtors. Accordingly, a hearing was scheduled for this Court to determine if the Reaffirmation Agreement was in the Debtors' best interest and therefore could be performed by the Debtors.

## II.   BANKRUPTCY COURT PROCEEDINGS

1. At the hearing on the Reaffirmation Agreement, the Debtors testified that they were at that time current on their payments due under the Contract and thought that they would have sufficient income after their bankruptcy discharge to continue timely making the payments to Coastal Federal in light of the other debts that they would no longer have to pay each month.

2. Notwithstanding these representations by the Debtors, the Court refused to approve the Debtors' Reaffirmation Agreement with Coastal Federal and entered an order to that effect on August 15, 2007.

3. Coastal Federal thereafter timely filed a motion to reconsider such order, taking issue with the provision contained therein to the effect that Coastal Federal would not be entitled to exercise its right to declare a post-discharge default by the Debtors under the Contract pursuant to 11 U.S.C. §521(d) and 362(h), which essentially revived the "ride through" option for these Chapter 7 debtors that the 2005 amendments to the Bankruptcy Code specifically eliminated.

4. A hearing was held on Coastal Federal's motion for reconsideration on October 31, 2007, at which time counsel for both parties appeared and presented their respective client's arguments. At the conclusion of such hearing, the Bankruptcy Court took the matter under advisement and ultimately entered its order of November 20, 2007 denying Coastal Federal's motion for reconsideration, which order is the subject of this appeal.

# ARGUMENT

**A. Congress' purpose with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 was to restore integrity to the bankruptcy system and promote fairness and equality among debtors and creditors.[3]**

As its name proclaims ("The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005") the 2005 Act was designed to restore equality and fairness in the bankruptcy process. It came at the end of a twenty year spurt in bankruptcy filings from 250,000 in 1978 to more than 1,500,000 filings in 2004. All but a small number of these filers were consumer debtors.

Academic commentators argued that the increased filings resulted principally from debtors' illness, loss of jobs and similar unanticipated and uncontrollable events, not from any rise in consumer profligacy or decline in consumer moral fiber. To the extent that the increase in filings seemed associated with consumers' new-found taste for credit card, home equity and other debt, the academic commentators blamed the creditors, not the debtors. In the eyes of the academic apologists, the children grew fat not because of the indulgence of their sweet tooth but because the candy store was too long open. In enacting the law, Congress disregarded all of these academic defenses of consumer behavior; Congress intended to administer strong medicine.

That is not to say that the birth of the Act was easy or quick. The original form of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005[4] was first introduced in 1998. In the succeeding years it passed the House six times, passed the Senate four, and it cleared both houses of Congress in the same form twice. Once it even reached the President's desk, only to suffer President Clinton's pocket veto.

---

[3] A portion of this section was authored by James J. White, Esq., Professor, University of Michigan School of Law, as part of a joint amicus brief with the undersigned in a separate matter. Professor White gave the undersigned his express permission to include these exerts in this brief.

[4] Referred to as "BAPCPA" or "the Act".

The Democrats in Congress were as persistent and clever in opposition to the Act as the Republicans were determined and united in support. A late game ploy by Senator Schumer was to bar bankruptcy discharge for certain liability arising from obstruction of abortion clinics[5]. This, of course, was an attempt to split the right wing support for the bill by turning the right to life senators against it. Throughout the process, the opponents offered alternative bills and succeeded in making many amendments to the majority's proposal.

Why was Congress so determined to reform the bankruptcy system? The answer is found in the House Report for the bill, which clearly lays it out:

> The purpose of the bill is to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors. With respect to the interests of creditors, the proposed reforms respond to many of the factors contributing to the increase in consumer bankruptcy filings, such as lack of personal financial accountability. (Sec. 256, H.R. 109-031 (2005)).

**B.     The new provisions related to reaffirmation agreements, read in conjunction with Congress' purpose of the Act, support a reversal of the Bankruptcy Court and a ruling in favor of Coastal Federal.**

Congress saw abuses in the reaffirmation process. As a result, it included in the Act many revisions and additions to the Bankruptcy Code specifically directed to eliminate these abuses and to provide significant protections to debtors and creditors alike. The following discussion is not a detailed analysis of each word of the relevant statutes, but an examination of how they relate to the larger purpose of Congress in enacting these statutes.

1.     <u>Debtor Protections</u>. Section 524(k) added many new disclosures in reaffirmation agreements to advise debtors of the consequences of reaffirming a debt.[6] This section, contained in the Act under the heading "Enhanced Consumer Protections," contains the following:

---

[5]  145 Cong. Rec. S14191

[6]  11 U.S.C. § 524(k)

*Sec. 203. Discouraging Abuse of Reaffirmation Agreement Practices.* Section 203 of the Act effectuates a comprehensive overhaul of the law applicable to reaffirmation agreements. Subsection (a) amends section 524 of the Bankruptcy Code to mandate that certain specified disclosures be provided to a debtor at or before the time he or she signs a reaffirmation.[7]

With these new disclosures and other consumer protection provisions, the standard reaffirmation agreement has expanded from three pages to eight pages. It includes new provisions in Part D that require a debtor to affirmatively state that the debt will not impose an undue hardship on the debtor and his or her dependents and requires the debtor to support this belief by demonstrating that he or she has the income to make the payments. To the extent that the income contained in Part D differed from the income stated in Schedules I and J filed with the petition, Interim Local Rule 4008 requires the debtor to explain this difference. In many instances, this difference is attributed directly to the fact that the debtor has or will eliminate a significant portion of his or her pre-petition debts through their bankruptcy discharge.

These new provisions show that Congress was concerned about the overreaching ability of creditors to pressure debtors into reaffirmation agreements. By requiring these additional disclosures to educate debtors about the effects and consequences of entering into a reaffirmation agreement and by requiring the debtors to analyze their true ability to afford the payments under the agreements, Congress significantly improved protections afforded to debtors and helped to ensure the system is fair for debtors. Thus far, courts have seen to it that these protections afforded to debtors are strictly adhered to.

    2.    <u>Creditor Protections</u>. Congress added multiple new provisions also designed to protect the rights of creditors by eliminating the debtor's ability to "ride through" Chapter 7 without surrendering, redeeming or reaffirming secured obligations. Prior to the enactment of

---

[7] Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 257, H.R. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. (2005)

BAPCPA, five circuits authorized a "fourth option," commonly referred to as the "ride-through," for debtors in a Chapter 7 case. These circuits held that a debtor is not required to surrender, redeem or reaffirm a secured obligation where the debtor is current on payments to the creditor and continues to perform the obligation under the contract terms.

Under BAPCPA, Congress inserted three entirely new sections[8] and one modified section[9] designed to eliminate this "fourth option." Section 521(a)(2)(A) was modified to make this section applicable to all secured debts, not just all secured consumer debtors, and Section 521(a)(2)(B) was redesigned to change the date for performing the debtor's stated intentions from 45 days after the filing of the notice of intent to 30 days after the date set for the meeting of creditors. *In re Donald*, 343 B.R. 524, 533 (Bankr. E.D.N.C. 2006). Section 521(a)(2)(C) was redesigned to say that nothing in subsections (A) and (B) shall alter the debtor's rights with regard to property, *except as provided in section 362(h)*. (emphasis added)

Section 362(h), a new Code section, terminates the automatic stay if the debtor fails to comply with the requirements of Section 521(a)(2) unless (1) the creditor refuses to enter into the agreement under the original contract terms or (2) the trustee obtains an extension of the automatic stay due to the consequential value of the property to the estate. "According to Collier on Bankruptcy, the 'apparent purpose' of § 362(h) is to 'encourage debtor compliance with section 521,' and the statutes should be construed together in order to give effect to both.'" *Id.* Citing 3 Colliers on Bankruptcy ¶ 362.10A, at 362-120 (Alan N. Resnick & Henry J. Sommer, 15th ed. Rev. 2006).[10] "The consequences of not complying with § 362(h)(1)(A) are

---

[8] 11 U.S.C. §§ 362(h), 521(a)(6) and 521(d).

[9] 11 U.S.C. § 521(a)(1).

[10] In its own footnote, the court in *Donald* states that "Collier suggests that the options listed in § 362(h)(1)(A) are joined with the word "or," and that since under the applicable rules of construction, "or" is not exclusive, the listed options are not exclusive. 11 U.S.C. § 102(5); 3 Collier on Bankruptcy ¶ 362.10A, at 362-119 to -120 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006) (referring to 11 U.S.C. § 102(5)). The problem with that

7

that the stay will terminate with respect to personal property of the estate or the debtor and that the personal property shall no longer be property of the estate." *Id.*

Section 521(a)(6) requires a debtor to redeem or to reaffirm a debt within 45 days of the meeting of creditors. If the debtor fails to do either of these things, the debtor shall not retain the property, the automatic stay is terminated and the property is no longer property of the estate.

Section 521(d) was added to the Code to specifically overrules the "fourth option" by expressly stating that bankruptcy default clauses in contracts are enforceable against a debtor where the debtor has failed to take timely action as specified in section 521(a)(6) or where the automatic stay is modified under Sections 362(h)(1) or (2).

3.  <u>Enforcement of Protections</u>. When looking at how these new provisions, taken together, fit into the purpose stated by Congress in enacting this bill, it is clear that Congress intended the "ride-through" to be eliminated and to impose some accountability and responsibility on debtors to make a commitment regarding their secured obligations and to impose consequences for failing to follow through with these commitments. As one court stated, "[m]ost courts interpreting the changes to the Code following BAPCPA are in agreement that Congress intended to and did succeed in eliminating the ride-through option to a debtor's treatment of her secured collateral by adding § 362(h) to the Code and referencing it in § 521(a)(2)." *In re Rice*, 2007 Bankr. LEXIS 945 (Bankr. E.D. Pa. 2007)[11].

---

analysis is that although the word "or" is construed to be, pursuant to § 102(5), non-exclusive, § 362(h) uses the construction 'either . . . or' which could be construed to set forth choices that are exclusive." *Id.* at 534.

[11] citing *In re Rowe*, 342 B.R. 341, 345 (Bankr. D. Kan. 2006) ("The 'fourth option' … is prohibited by § 362(h)(1)(A)"); *In re Steinhaus*, 349 B.R. 694, 701 (Bankr. D. Idaho 2006) ("the 'ride' through' option on personal property securing an individual's debt is seriously impacted if not 'eliminated' outright.") (citations omitted); *In re McFall*, 356 B.R. 674, 676 (Bankr. N.D. Ohio Nov. 22, 2006) ("Every published bankruptcy court decision has similarly interpreted the plan language of § 362(h)(1)(A) to require a debtor to state an intention to redeem or reaffirm"); *In re Riggs*, 2006 Bankr. LEXIS 2732, 2006 WL 2990218, at *1 (Bankr. W.D. Mo. Oct. 12, 2006) ("the Code now provides adverse consequences if the debtor does not perform one of the three specifically-enumerated options"); *In re Ruona*, 353 B.R. 688, 691 (Bankr. D.N.M. 2006) (same).

However, despite this overwhelming acknowledgment by the courts that the ride-through has been eliminated, some courts are finding creative ways to avoid getting rid of the ride-through. In *Rice*, the court recognized the irony of the conflicting positions the *Donald* court has taken:

> [A]ccording to one court, termination of the stay, which is the consequence imposed by § 362(h) if a debtor fails to surrender the property, redeem, or reaffirm the debt, "does not mean the 'ride-through' option is eliminated." *In re Donald*, 343 B.R. 524, 534 (Bankr. E.D.N.C. 2006). Donald bases this statement on the fact that the Fourth Circuit Court of Appeals has held that "a default-on-filing clause in an installment loan contract was unenforceable as a matter of law." 343 B.R. at 534 (citing *In re Belanger*, 962 F.2d 345, 348 (4th Cir. 1992)). In other words, even if the stay is terminated pursuant to § 362(h), the creditor still my run into a road-block in getting back its collateral if the debtor is not found to have defaulted on the contract in the first place.
>
> Four pages later, however, the *Donald* court acknowledges that the addition of § 521(d) to the Code following BAPCPA "significantly changes" the *Belanger* ruling and the doctrine that default-on-filing clauses are invalid. 343 B.R. at 538. Newly added § 521(d) removes the prohibition on the effectiveness of *ipso facto* defaults by stating that "If the debtor fails to take the action specified in subsection (a)(6) of this section, or in paragraphs (1) and (2) of section 362(h)… nothing in this title shall prevent or limit the operation of a provision in the underlying lease or agreement that has the effect of placing the debtor in default under such lease [or agreement] by reason of the occurrence, pendency, or existence of a proceeding under this title or the insolvency of the debtor." This provision "makes it possible for a creditor who has such a clause in its agreement to make the choice to repossess personal collateral and foreclose on it." Jean Braucher, Rash and Ride-Through Redux: The Terms for Holding on to Cars, Homes and Other Collateral Under the 2005 Act, 13 Am. Bankr. Inst. L. Rev. 457, 477 (2005). The significance of § 521(d)'s treatment of *ipso facto* default clauses is "simply that when a debtor fails to timely take actions required by §521(a)(6), or § 362(h)(1) or (2), the new statutory language… enables creditors to proceed under contractual default clauses without limitations imposed by the Bankruptcy Code."

*In re Rice*, 2007 Bankr. LEXIS 945 (Bankr. W.D. Mo. Oct. 12, 2006). *Id.*

Other courts have recognized that applying the literal meaning of the language of the statutes may produce results that were in direct conflict with the true intent of Congress, and the

statutes should, therefore, be given the meaning that supports Congress' true intent. For example, in addressing the language of § 521(a)(6), the court in *In re Rowe*, 342 B.R. 341 (Bankr. D. Kn. 2006) found that applying the meaning of term "allowed claim" as describe in section 502 of the Code to this statute would produce results so absurd that the application of § 521(a)(6) would be so limited as to render it useless. The court explained its position as follows:

> Th[e] construction of "allowed claim" [in section 521(a)(6)] is problematic. The Court does not believe that Congress could have intended the phrase "allowed claim" to have the clear meaning ascribed to it by operation of § 502, since this construction of "allowed claim" renders the section applicable only in asset Chapter 7 cases where a secured creditor files a proof of claim after the clerk has given notice that assets are available for distribution. The Court therefore considers an additional rule of construction:
>
>> The plain meaning of legislation should be conclusive, except in the "rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." In such cases, the intention of the drafters, rather than the strict language, controls." [12]
>
> The legislative history of the section does not limit its applicability to creditors holding "allowed claims." Rather, the House Report to § 304(1) of BAPCPA states:
>
>> *Sec. 304. Debtor Retention of Personal Property Security.* Section 304(1) of the Act amends section 521(a) of the Bankruptcy Code to provide that an individual who is a Chapter 7 debtor may not retain possession of personal property securing, in whole or in part, a purchase money security interest unless the debtor, within 45 days after the first meeting of creditors, enters into a reaffirmation agreement with the creditor, or redeems the property. If the debtor fails to so act within the prescribed period, the property is not subject to the automatic stay and is no longer property of the estate. [13]
>
> This report does not use the phrase "allowed claim." If the word "allowed" is disregarded in the construction of the subsection, it will have applicability in all Chapter 7 individual cases, not only asset cases. This Court is of the opinion that this was the intent of Congress and that this is one of those rare cases where the

---

[12] *United States v. Ron Pair Enter., Inc.*, 498 U.S. 235, 242 (1989).

[13] Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R. Rep. No. 109-31, Pt. 1, at 70-71 (2005).

literal application of the statute would produce a result demonstrably at odds with the intentions of the drafters. [14] In this case, the Bank has a claim and the debtor is an individual, therefore, using the Court's construction, § 521(a)(6) is applicable. *In re Rowe*, 342 B.R. 341 (Bankr. D. Kn. 2006).

In addition, in *Dumont v. Ford Motor Credit Co. (In re Dumont)*, ___ B.R. ___ (BAP 9th Cir. 2008) (opinion attached), the court addressed the phrase "allowed claim for the purchase price" found in § 521(a)(6) to give effect to Congress' true intent of the statute. The court stated:

> [A]s used in section 521(a)(6) the words "purchase price" are essentially synonymous to a purchase money security interest (as stated in BAPCPA's legislative history[15]). Otherwise the section would probably be meaningless and have virtually no application because few automobile lenders finance cars without some form of down payment, and any amount of down payment would reduce the creditor's claim to an amount less than the purchase price.
>
> Further, any payments on the debt however small would reduce the amount of the purchase price and thus deny a creditor the protections of section 521(a)(6). It makes no sense for the statute to work only in favor of a creditor of a debtor who has paid nothing. We agree with Steinhaus and Rowe and interpret this section to apply to a purchase money security interest regardless of any subsequent partial payment by the debtor.

The *Rowe* and *Dumont* courts clearly focus on the intent of Congress and how to effectively apply the statutes to achieve Congress' purpose. Interpreting the statutes in a way that could be described as a "gotcha" to the drafters would be an injustice to the legislation that sought to restore equality and fairness to the bankruptcy system. While the right outcome of this case may be a departure from what courts have been accustomed to for many years (*i.e.* allowing the "ride-through"), Congress intended to return the debtor's options to those specifically authorized by the Code: surrender, redemption or reaffirmation. The job of the courts is to carry out Congress' purpose, not to find a way to return the system to the way it was before the Act.

---

[14] See *Waugh v. Internal Revenue Service*, 109 F.3d 489, 493 (8th Cir. 1997) (holding that although § 108(c) states that it tolls priority periods only in nonbankruptcy cases, Congress intended § 108(c) and 26 U.S.C. § 6503(b) and (h) to toll the three-year period of § 507(a)(8)(A)(i)).

[15] H.R. Rep. No. 109-31, pt. 1 at 70-70 (2005) (chapter 7 debtor may not retain possession of personal property securing a purchase money security interest, unless the debtor timely reaffirms or redeems the property).

4.      <u>Legislative History</u>.  The legislative history, though arguably very sparse despite the radical changes imposed by this new legislation, provides much guidance.  As mentioned above by the *Rowe* court, the legislative history's brief statements do support the notion that Congress's intent was to impose some accountability on the debtors in the reaffirmation process by the lifting of the automatic stay if they failed to timely reaffirm the debt.  Nowhere else in the legislative history of the 2005 Act does it appear that Congress contemplated that the statutes related to creditor's rights would be selectively enforced by courts.  If Congress had intended for these creditors protections not to be enforceable where the court had disapproved a fully executed reaffirmation agreement, Congress could have said so.  It did not.  Therefore, where Congress has stated its purpose and intent and has acted to carry forward that objective, the courts must not look for ways to side-step those objections.

**C.     The Bankruptcy Court's decision unfairly impairs the rights of creditors to protect and recover the value of their investment.**

Let's step away from the technical analysis of the statutes and look at the practical effect of the Bankruptcy Court's ruling.  The Bankruptcy Court, in essence, reinvented the "ride-through," despite its affirmative statements to the contrary in *Donald* that "ride-through" may be dead.  If this decision is to stand, we find ourselves back where we were before BAPCPA, with creditors in the same unfair position they were in before BAPCPA and again being forced the continue to do business with high-risk debtors at the expense of having to sit on the sidelines and watch their investments quickly slip away.

To illustrate this point, let's look at the parties' respective interests following the disapproval of signed reaffirmation agreement.  For the debtor, he or she is virtually guaranteed the risk-free right to operate a vehicle for which he has no incentive to care.  He or she has no personal liability for the remainder of the debt owed to the creditor, so there is no sense of need

to preserve the value of the vehicle because the debtor has no vested personal responsibility or accountability. It is simply a hunk of metal that can be discarded at any time through no consequence at all to the debtor. With no vested personal responsibility, accountability or consequences for the deterioration in the condition of the vehicle, the debtor has no incentive to care for the vehicle, such as performing regular or needed maintenance or to insure the vehicle. Why maintain collision insurance if one can walk away from the vehicle following an accident with no recourse? The debtor has no incentive to protect the value of the vehicle.

The creditor, on the other hand, having unwillingly been forced to continue to do business with a high-risk debtor, now must accept all of the risks of the on-going relationship. The creditor is prohibited from enforcing its state law rights that were bargained for under the contract – the right to recover its collateral in the event the debtor sought bankruptcy protection – while the debtor is able to ignore the promises it made.

Is it fair to force the creditor to remain in a relationship that may jeopardize its ability to recover its investment? Certainly, the answer is no. In most financial transactions, the creditor has assessed the risk of loss prior to entering into the transaction through assessing the individual's creditworthiness and the collateral's value. When the debtor's personal liability is discharged in bankruptcy and the collateral remains out of reach of the creditor, the creditor is without the two things it based its decision to enter into the transaction. Instead of increasing the creditor's rights to offset for the heightened risk of loss from having the personal liability discharged, allowing ride-through exacerbates the risk of loss by keeping at arm's length the one part of the credit transaction that provides some relief to the creditor. Like Congress, courts should recognize that creditors' rights are as equally important as those of debtors. Reaffirmation agreements, codified by the Bankruptcy Code, are a mechanism by which the

debtors and creditors can re-establish equal grounds in the credit transaction to give them both the financial incentive and the vested interest in completing the transaction. If debtors are unwilling to re-establish this accountability and responsibility, creditors should be allowed to end the relationship at its choosing.

Lastly, allowing the ride-through to continue could ultimately prove an injustice to the debtors the court is trying to protect. Many debtors need to rid themselves of an overly burdensome obligation and obtain more affordable transportation. By allowing "ride-through" to continue, debtors have the easy option of continuing with their current financial arrangements and have no incentive to walk away from these transactions that very likely contributed to their need for bankruptcy relief in the first place. Allowing "ride-through" may actually delay a debtor's fresh start.

## **CONCLUSION**

Through the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress sought to re-establish fairness, integrity and responsibility in the bankruptcy system. It properly recognized that for the system to work in a manner that was fair and equal to both debtors and creditors, it needed to promote fairness and equality in the reaffirmation process. Congress enacted statutes to protect debtors from overreaching and abusive creditors while at the same time offering protection to the creditors who chose to participate in the reaffirmation process. The Bankruptcy Court's decision in this case destroys the sense of fairness and equality that the Act sought to promote. This court should reverse the Bankruptcy Court's decision and recognize the rights provided to creditors by the Bankruptcy Code.

February 26, 2008

POYNER & SPRUILL LLP


By: s/ James S. Livermon, III
NC State Bar No. 26492
Post Office Box 353
Rocky Mount, NC 27802-0353
Telephone: (252) 972-7091
Facsimile: (252) 972-7045
Email: jlivermon@poynerspruill.com

*Attorneys for Credit Union National Association and the North Carolina Credit Union League*

## **CERTIFICATE OF SERVICE**

I, the undersigned, of Poyner & Spruill LLP, hereby certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on this day, I served a copy of the foregoing Amicus Brief in Support of Appellant by the Credit Union National Association and the North Carolina Credit Union League on:

> Pamela P. Keenan
> Attorney for Appellant
> Post Office Box 19766
> Raleigh, NC 27619
>
> Joshua Hillin
> Attorney for Appellee
> 6616-203 Six Forks Road
> Raleigh, NC 27615
>
> John F. Logan
> Chapter 13 Trustee
> P.O. Box 61039
> Raleigh, NC 27661-1039

by depositing the same in the United States mail, first class, postage prepaid.

I certify under penalty of perjury that the foregoing is true and correct.

February 26, 2008

> POYNER & SPRUILL LLP
>
> By: s/ James S. Livermon, III
> NC State Bar No. 26492
> Post Office Box 353
> Rocky Mount, NC 27802-0353
> Telephone: (252) 972-7091
> Facsimile: (252) 972-7045
> Email: jlivermon@poynerspruill.com
>
> *Attorneys for Credit Union National Association and the North Carolina Credit Union League*